# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| SAMFORD UNIVERSITY, | ) |
| Plaintiffs, | ) |
| v. | ) Case No.: 2:18-cv-01092-JHE |
| STERICYCLE, INC., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION[1]

Defendant Stericycle, Inc. ("Stericycle") removed this action from the Circuit Court of Jefferson County, Alabama on July 16, 2018. (Doc. 1). On August 8, 2018, within the time prescribed to do so, Plaintiff Samford University ("Samford") moved to remand, arguing Stericycle's removal was untimely. (Doc. 7). Stericycle has filed a response in opposition to remand, contending its removal was timely because Samford's complaint did not provide the "required specific and unambiguous notice" of the amount in controversy.[2] (Doc. 13 at 6). Samford also filed a reply brief in support of its motion. (Doc. 14). The motion to remand is ripe for review. For the reason's stated below, the motion to remand is **GRANTED**.

## I. Procedural and Factual Background

Samford filed this action against Stericycle on February 20, 2018, in the Circuit Court of Jefferson County, Alabama. (Doc. 7-1; Case No. 01-CV-2018-900723.00). On April 9, 2018,

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 9).

[2] In its response, Stericycle requests oral argument on the motion. (Doc. 13 at 1). That request is **DENIED**. The undersigned does not believe oral argument is needed in light of the complaint, briefing, as well as case and statutory law available.

Stericycle filed a motion to dismiss pursuant to Alabama Rule of Civil Procedure 12(b)(6). (Doc. 1-1 at 2). After briefing, Judge Carole Smitherman held a hearing, then, on May 10, 2018, entered an order denying Stericycle's motion to dismiss. (*Id.*). The parties then negotiated a proposed scheduling order, which the Circuit Court adopted on May 29, 2018. (*Id.*).

Samford served discovery on May 4, 2018, with responses originally due on June 4, 2018. (*Id.*). Stericycle proposed that, instead of responding to discovery by the deadline, counsel for Samford should submit a settlement proposal. (Doc. 7 at 3). Samford delivered the Settlement Proposal to Stericycle on June 19, 2018.[3] Stericycle did not respond to the Settlement Proposal. On July 16, 2018, Stericycle filed a Notice of Removal in this Court. (Doc. 1).

## II. Analysis

Under 28 U.S.C.§ 1441, a defendant may remove a case filed in state court to federal court when the federal court would have had original diversity jurisdiction. 28 U.S.C.§ 1441(a), § 1332. The removing defendant has the burden to establish that the parties are citizens of different states and that the amount in controversy exceeds $ 75,000.00. *See Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001). Additionally, there is a time limit for removal. A defendant can remove within thirty days of: (a) "receipt . . . of the initial pleading," or (b) "if the case stated by the initial pleading is not removable . . . after receipt by the defendant . . . of an amended pleading, motion, order, or other paper from which it may first be ascertained that the case is one which is or has become removable." *See* 28 U.S.C. § 1446(b)(1) & 3.

Samford does not dispute that the parties are citizens of different states or that the amount in controversy exceeds $ 75,000.00. (*See* doc. 7). Instead, Samford contends that Stericycle's

---

[3] According to Samford, the Settlement Proposal was intended to be a global settlement offer and was made on behalf of more than twenty individual entities represented by Samford's counsel. (Doc. 7 at 1 n.1). Samford asserts its demand was for $ 750,000.00. (*Id.*).

removal was untimely because Stericycle knew or had reason to know that the amount in controversy exceeded $ 75,000.00 based on the complaint. (*Id.*). Stericycle disputes this, arguing the complaint did not provide the required specific and unambiguous notice to trigger the thirty-day removal period in 28 U.S.C. § 1446(b)(1). (Doc. 13). Instead, Stericycle argues the "other paper" provision, found in 28 U.S.C. § 1446(b)(3), applies because the first opportunity for it to ascertain the amount of controversy occurred when it received the Settlement Proposal. (*Id.*). The resolution of the parties' discord turns on when the removal clock began; specifically, whether the allegations in Samford's complaint were sufficient to trigger the thirty-day removal period in § 1446(b)(1).

To answer this question, the court must "determine at what point [Stericycle] could have *intelligently ascertained* that the action was removable through reasonable scrutiny of the pleadings and facts of the action as it developed in state court." *Naef v. Masonite Corp.*, 923 F. Supp. 1504, 1512 (S.D. Ala. 1996) (emphasis added). This Court has described this inquiry as the "intelligently ascertained" standard. *See Jones v. Hartford Fire Ins. Co.*, Case No. 12-cv-2879-RRA, 2013 WL 550438, at *2 (N.D. Ala. Jan. 16, 2013) (adopted and approved, Feb. 7, 2013). Even when damages are not specified in the complaint, it can be apparent from the allegations that the amount in controversy exceeds $ 75,000.00. *See Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1061 (11th Cir. 2010).

Samford's complaint alleges that Stericycle, a medical waste business, "intentionally structured" its acts and practices in dealing with Samford "to create confusion and misunderstanding." (Doc. 7-1 at ¶ 3). Specifically, Samford alleges "Stericycle enters into long-term 'fixed-rate' contracts with its customers," but "arbitrarily charges its customers ever-escalating amounts through automated price increases that are without justification of any kind."

3

(*Id.*). Samford details the alleged method Stericycle uses to impose arbitrary "Automated Price Increases" as follows:

> 16. Stericycle may increase the monthly or quarterly flat fee only under limited conditions during the term of the contract:
>
>> Stericycle reserves the right to adjust the contract price to account for operational changes it implements to comply with documented changes in law, to cover increases in the cost of fuel, insurance, residue disposal, or to otherwise address cost escalation.
>
> 17. Despite these limitations under which Stericycle may increase its fees, Stericycle has engaged in a systematic and deliberate practice of raising its fees based on annual automated price increases ("API") of 18% on Steri-Safe Contract customers. These predetermined price increases were unconscionable, deceptive, fraudulent, improper, and just plain wrong because they bear no relationship to Stericycle's "operational changes," "documented changes in the law," or "cost escalation."
>
> 18. Stericycle's Vice President of Sales Operations explained automated price increases as follows:
>> Q. …what's your understanding of the term "automated price increase"?
>>
>> A. Automated price increase is a system-generated price increase that's applied to the customer's pricing.
>>
>> Q. And for small quantity customers who have not -- whose contract does not specifically state what their future pricing is going to be, unless that customer is for some reason exempted from the automated price increase process, those price increases are imposed on the customer by a function of Stericycle's billing system; is that right?
>>
>> A. Yes.
>
> Deposition of James Edward Buckman, pp. 30-31. He continued:
>
>> Q. During your time at Stericycle it's been true, hasn't it, that the standard automated price increase percentage for small quantity customers was 18 percent?
>>
>> A. Yes.
>
> *Id*. at 32.

19. Stericycle uses (or has used) an electronic financial accounting and reporting system named "Tower." The automated price increase process is built into the Tower system, but the intervals at which Stericycle has imposed API has varied. Stericycle modulated the timing of the API in order to meet revenue targets – there was no connection to actual cost increases that might justify a price increase. Automated Price Increases are a major revenue source for Stericycle.

20. Stericycle's costs fluctuate and do not uniformly increase from year-to-year, but Stericycle does not modify the API to reflect these fluctuations. Stericycle does not internally correlate the API to its own costs. Stericycle's costs do not increase 18% every nine or twelve months.

21. In a deposition, Mr. James Edward Buckman (Stericycle's Vice President of Sales Operations) conceded that automated price increases are implemented to make sure that Stericycle achieves the revenue numbers it has predicted. The increases bear no relation to actual costs. In the words of Mr. Buckman:

> Q. And what about, have you ever heard mention of needing to increase revenue in order to meet the revenue forecasts that Stericycle gives to the investment community?
>
> A. I would say that's part of our internal goal. That's related to our internal goal.
>
> Q. ….you're concerned more with meeting revenue targets rather than being concerned about the cost of providing services or products to Stericycle's customers; isn't that right?
>
> A. That is the primary focus of the sales and marketing organization.
>
> Q. So, you are given a revenue goal and you figure out how to meet that goal, but in making decisions in order how to do that, you don't specifically consider Stericycle's cost of, you know, how much it cost to provide services to any specific customer or type of customer; isn't that right?
>
> A. I don't understand the question.
>
> Q. Well, I think you said it's another part of Stericycle's organization that keeps track of the cost of providing goods and services to customers, right?
>
> A. Correct.
>
> Q. You are given a revenue target or a revenue goal that you are expected to meet along with your colleagues, and you come up with

initiatives in ways that you think that you can meet that goal, correct?

A. Correct.

Q. But when you are making decisions about specific initiatives, such as changing the frequency of automated price increases, you don't go back and look and say, hey, how much is – you know, how much is it costing us to dispose of medical waste, how much are we paying for labor or any other specific cost factors when you are making those revenue decisions, do you?

A. Not specifically.

Q. You -- because from your point of view, whatever decisions there are about maintaining gross margins, those are made in setting the goal of revenue that you are expected to generate, right?

A. Right.

Q. So, when you are deciding whether to change the frequency of automated price increases, you don't need to go back and look at those cost figures; all you need to do is make sure you hit your revenue numbers in order to make sure you keep your margins, right?

A. In my role, yes.

Deposition of James Edward Buckman, pp. 68-70.

22. The price increases that Stericycle imposed on small-quantity customers such as the Plaintiff can be determined from the electronic records contained in Stericycle's financial reporting systems.

(Doc. 7-1 at ¶¶ 16-22).

Samford then details the alleged fee-hike scheme Stericycle used in its dealings with Samford as follows:

32. In or about June 2005, Plaintiff entered into a Steri-Safe Service Agreement with Stericycle. Stericycle induced Samford to sign its original contract by representing to it that the contract would be a fixed rate contract.

33. In September 2005, Samford paid $55.50 for waste disposal services at its University Health Center. By September 2008, Samford was paying $117.75 for

6

the same service. In September 2011, Samford was paying $319.49 monthly for the University Health Center waste services, and in September 2014, the same service was $414.86. By May 2017, the same service had escalated to $769.25, nearly 14 times the amount that Samford paid in 2005.

34. This pattern repeated itself in invoices for waste disposal services at Samford's Biology Department. In May 2011, Samford paid $269.56 per month for Biology Department waste disposal. Two years later, Stericycle charged $824.78 per month for the same service. With no increase in services provided, Stericycle had raised prices to more than triple the amount that it charged only two years earlier. This was only the beginning. By May 2015, Stericycle was billing Samford $4,343.62 per month for the same service, or approximately 16 times what it had charged just four years earlier. By May 2017, the monthly charge escalated to the exorbitant amount of $9,229.77. Notwithstanding the doubling of the monthly charge over the previous two-year period, by May 2017, the monthly price had risen by a multiple of 34 in just six years.

35. Throughout Samford's dealings with the Defendant, Stericycle implemented improper and unlawful price increases and overcharges, including prices increases resulting in an unjustified multiplying of Samford's costs.

36. One way Stericycle justified increased charges was to claim that it had to specially dispose of certain of Samford's waste via "red box" services for biohazardous waste. It has since come to light that Stericycle threw this trash away with the rest of its waste collections—the red boxes were only a ruse and the increased prices were entirely unjustified and misrepresented.

37. None of Stericycle's prices increases has been proper or justified under Stericycle's contract with Samford.

38. Upon discovery of Stericycle's fraudulent actions, Samford terminated its contracts with Stericycle on August 8, 2017.

(Doc. 7-1 at ¶¶ 32-38).

As reproduced above, ¶ 37 of the Complaint alleges that "[n]one of Stericycle's price increases has been properly justified under Stericycle's contract with Samford." (*Id.* at ¶37). Therefore, when using reasonable scrutiny, Stericycle should have known that Samford would be seeking recovery of a specific overage amount for each month within the limitations period. Paragraph ¶ 34 provides a specific example of what Samford contends was wrongful price escalation for waste disposal services at its Biology Department. (Doc. 7-1 at ¶ 34). The

allegations compare prices for May 2011, May 2013, May 2015, and May 2017, stating those were $ 269.56, $ 824.78, $ 4,343.62, and $ 9,229.77, respectively. (*Id.*). Thus, from May 2011 to May 2017, Samford alleges Stericycle increased its monthly rate by $ 8,960.21, for this location. Although Samford admits some automatic price increases were expected, these allegations put any reader on notice that Samford is seeking thousands of dollars for each month it alleges it paid an excessively increased rate. Thousands of dollars a month for several years clearly approaches if not exceeds the amount in controversy.

Additionally, although Stericycle asserts and Samford agrees that treble damages are not available under the Illinois Consumer Fraud Act (doc. 13 at 12; doc. 14 at 2 n.1), Samford also seeks punitive damages. Punitive damages are available for both the common law fraud claim Samford asserts and the Illinois Consumer Fraud Act. (Doc. 7-1); *see Keeling v. Esurance Inc. Co.*, 660 F. 3d 273, 275 (7th Cir. 2011) (accepting a punitive damages multiplier of more than three under the ICFA).

Punitive damages must be considered when determining the jurisdictional amount, unless it is a "legal certainty" that they are not available. *See Holley Equip. Co. v. Credit Alliance Corp.*, 821 F.2d 1531, 1535 (11th Cir. 1987); *Rae v. Perry*, 392 Fed. Appx. 753, 755 (11th Cir. 2010). Stericycle does not challenge Samford's allegation that punitive damages are available. While seeking punitive damages alone may not automatically confer federal jurisdiction,[4] Samford's complaint alleges a premediated and systematic effort to improperly increase fees to reach earning targets, which, if found to be true, would support a substantial punitive damages award.

---

[4] *But see Smith v. State Farm Fire & Casualty Co.*, 868 F Supp. 2d 1333 (N.D. Ala. 2012) (holding that cases with unspecified damages, such as for emotional distress and punitive damages, exceed the amount in controversy and are removable unless the plaintiff expressly disclaims any entitlement to more than $ 74, 999.99).

Upon reading Samford's complaint, it is intelligently ascertainable that the amount in controversy exceeds $ 75,000.00. Standing alone, the alleged monthly overcharges may be sufficient, and when considering punitive damages, there can be no question that the amount in controversy threshold is exceeded. To the extent Stericycle argues "facially apparent" means that damages must be calculable (doc. 13 at 9), that argument is not supported by the law.

Because it is intelligently ascertainable from the complaint that Samford is seeking more than $ 75,000.00, the thirty-day time period to remove this action was triggered by Stericycle's receipt of the complaint on February 22, 2018 (doc. 1-1 at 26) pursuant to 28 U.S.C. § 1446(b)(1). On that day the thirty-day removal period began to run, expiring on March 24, 2018. Accordingly, Stericycle's July 16, 2018 removal is untimely.

Samford's request for attorneys' fees and costs incurred in responding to Stericycle's removal is **DENIED**.

### III. Conclusion

Because it is intelligently ascertainable from the complaint that Samford is seeking more than $ 75,000.00, the thirty-day time period to remove this action was triggered by Stericycle's receipt of the complaint pursuant to 28 U.S.C. § 1446(b)(1). Accordingly, Stericycle's removal is untimely. The motion to remand (doc. 7) is **GRANTED**, and this action will be dismissed. A separate order will be entered.

DONE this 31st day of August, 2018.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE